IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

BOB JAMBOIS,

                Plaintiff,

v.

ISMAEL OZANNE, COREY STEPHAN,
MATT MOESER and MARY ELLEN KARST,
each in his or her own individual capacity,

                Defendants.

OPINION AND ORDER

17-cv-156-wmc

---

Plaintiff Bob Jambois alleges that Dane County District Attorney Ismael Ozanne and several of his assistants drove Jambois from his position as an assistant district attorney in retaliation for his unsuccessful electoral challenge to Ozanne. Before the court are defendants' motions for summary judgment (dkt. #67) and to strike the expert report and testimony of Judge Michael Malmstadt (dkt. #96). For the reasons that follow, the court will deny summary judgment, while reserving judgment on the motion to strike.

BACKGROUND[1]

A. The Parties

Plaintiff Bob Jambois joined the Dane County District Attorney's office as an assistant under defendant Ozanne in 2015, having previously served as Kenosha County District Attorney from 1989 to 2005. Jambois was assigned to the Dane County serious felony crimes unit, which was created to ensure that experienced prosecutors were assigned

---

[1] Viewing the evidence of record in the light most favorable to plaintiff, the following facts are material and undisputed for purposes of summary judgment unless noted otherwise.

to felony cases requiring the most attention. (D's Resp. to PFOF (dkt. #126) ¶¶ 32-33.) In addition, defendants Corey Stephan, Matt Moeser and Mary Ellen Karst were assistant Dane County district attorneys during Jambois's employment with Dane County.

### B. 2016 Dane County District Attorney Election

Not long after his hiring, Jambois challenged Ozanne in the Democratic primary for Dane County District Attorney. Although already in the wind by May of 2016, Jambois officially announced his candidacy in June of 2016, after Ozanne, who is African-American, stated during a meeting of all Dane County prosecutors that unspecified racist conduct was taking place in the office. (D's Resp. to PFOF (dkt. #126) ¶¶ 47, 62.) The subsequent primary campaign was acrimonious, involving serious allegations of professional neglect and racism. (*Id*. at ¶¶ 69, 98.) Naturally, this caused some amount of division in the office. In August of 2016, Ozanne defeated Jambois in the primary and went on to win another term in office.

### C. Alleged Retaliatory Conduct and Constructive Discharge

Shortly after Ozanne's victory, Jambois alleges that he and the other defendants initiated a campaign of retaliation, while the defendants maintain they had abstained from acting on preexisting concerns about his performance during the primary. (D's Resp. to PFOF (dkt. #126) ¶ 108.) The parties do agree that on August 18, 2016, just after his election defeat *and* despite a directive to avoid involvement, Jambois notified defendants that "[o]ne way or another," he intended to prosecute the retrial of Mark Jensen, who he had convicted of murder as the Kenosha County District Attorney. (DPFOF (dkt. #69)

2

at ¶ 116.) Jambois recognized this might require his resignation, and he stated that he was flexible as to the date. (*Id*. at ¶ 117.) Jambois further stated on August 23, 2016, that he anticipated he would need to resign "no later" than January 27, 2017, to prepare for the retrial. (*Id*. at ¶ 126.) Just three days later, on August 26, 2016, when defendant Stephan met with Jambois and indicated that he was prepared to accept his resignation, Jambois maintains he was shocked and did not resign. (D's Resp. to PFOF (dkt. #126) at ¶¶ 195-98.) While Jambois claims this signaled that defendants sought to terminate him, defendants maintain Stephen only raised the subject because Jambois had already done so.

After this August 26 meeting, Stephan provided Jambois with a notice of investigatory review, written on Ozanne's letterhead and signed by Stephan. That notice expressed concern about several alleged workplace issues, including Jambois's misuse of paralegals to review and charge criminal cases, failure to respect witness schedules, and intention to remain involved in the Jensen matter. (DFOF (dkt. #69) at ¶ 161.) Jambois then met with defendants Stephan and Moeser for an investigatory interview on August 29, 2016, although the parties dispute whether this constituted a disciplinary hearing. (P's Resp. to DFOF (dkt. #111) ¶ 162.) During that meeting, Jambois confirmed that he intended to retry the Jensen matter. (DFOF (dkt. #69) at ¶ 163.)

On September 8, 2016, Jambois received a "Letter of Expectation," also written on Ozanne's letterhead, outlining concerns that largely mirrored the notice of investigatory review. The letter stated that "to address specific issues, going forward [Jambois] will abide by . . . additional rules specific to [Jambois]." (D's Resp. to PFOF (dkt. #126) at ¶ 215.) Despite this language, defendants dispute that Jambois was actually subjected to policies

3

that were specific to him. Jambois specifically argues that his use of paralegals to draft charging decisions was employed by others in the office, including defendant Stephan. (*Id*. at ¶¶ 293-94.) His account is supported by a former office paralegal and another former assistant district attorney. (*Id*. at ¶¶ 292, 301.) The letter also set scheduling requirements for meeting with witnesses, which Jambois alleges became unworkable. (*Id*. at ¶ 259.) Finally, Jambois was expressly required to withdraw from the Jensen retrial. (*Id*. at ¶ 354.) The parties dispute whether Jambois worked on the Jensen matter "in any formal sense" after this point. (P's Resp. to DFOF (dkt. #111) at ¶ 128.)

Jambois also alleges that the defendants manipulated his caseload, rendering him unable to provide adequate representation in his cases. This allegation centers on defendant Karst's transfer of the twenty "most important, highest priority cases" as selected by a departing young prosecutor. (D's Resp. to PFOF (dkt. #126) at ¶¶ 229, 237.) For his part, the departing prosecutor expressed "surprise" that all of these cases were assigned to Jambois, believing it was done in retaliation for the election. (O'Connell Deposition (dkt. #66) 53-54.) Karst disputes this, maintaining the twenty cases involved traffic incidents that were "way less work" and did not bring Jambois "even close to parity" with the caseload of the most similarly experienced prosecutor in the felony unit. (Karst Deposition (dkt. #60) 127-28.) While only two of the twenty cases actually went to trial, Jambois maintains he reached out to defendants to obtain relief from his anticipated trial calendar, but nothing came of it. (P's Resp. to DPFOF (dkt. #111) at ¶¶ 150, 155-56.)

Finally, Jambois claims he communicated to the defendants that the witness procedures were too onerous and that placing these conditions on him alone was an act of

4

retaliation. (D's Resp. to PFOF (dkt. #126) at ¶¶ 257-59.) Defendants never responded. (*Id*. at ¶ 260.) The parties dispute whether these procedures resulted from a sincere desire to correct deficient performance or were pretextual retaliation. (P's Resp. to DPFOF (dkt. #111) at ¶ 172.) Ultimately, Jambois alleges these unreasonable demands caused his work to suffer and that he was forced to retire in September, 2016, because he could no longer provide effective representation in his assigned cases.

OPINION

**DEFENDANTS' MOTION TO STRIKE**

As a preliminary matter, defendants move to bar the expert report and testimony of Judge Michael Malmstadt (dkt. #96), arguing that he employed no recognized scientific, technical or other specialized knowledge that would assist the trier of fact. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). While Malmstadt *may* have specialized knowledge that would assist the jury here, many of the legal opinions and purported statements of fact set forth in his written expert report appear to invade either the court's or the jury's province, and to raise concerns about their relevance. Nevertheless, his opinion as to plaintiff's claim of unreasonable expectations and increase in his personal workload (portions of opinion 1.iv. and v.) may assist a lay jury. Accordingly, the court will reserve judgment on defendants' motion to strike and take the issue up, along with the proposed testimony of James J. Martin, at the final pretrial conference.

Under Fed. R. Evid. 702, which guides this court's "gatekeeping" discretion:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an

> opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

"[B]ecause there are 'many different kinds of experts, and many different kinds of expertise,' the reliability analysis should be geared toward the precise sort of testimony at issue and not any fixed evaluative factors." *Lees v. Carthage College*, 714 F.3d 516, 521 (7th Cir. 2013) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999)).

While Judge Malmstadt certainly possesses wide experience as a prosecutor and judge, it is unclear just how his professional knowledge would aid the jury's deliberations. For example, he proposes to testify about the allegedly strained relationship between the Dane County District Attorney's Office and local judges, which Jambois cites as a reason why he chose to run for office. But such information appears irrelevant in determining whether Jambois faced retaliation *after* he ran for office. It is also unclear why a jury would need specialized expertise to understand such strain. The same is true of Judge Malmstadt's disapproval of Ozanne speaking during a meeting about a racism problem in the office, which Jambois also cited as a reason why he chose to run for office.

Another apparent invasion of the province of the jury is Judge Malmstadt's conclusions about defendants' management of Jambois, as he opines that the investigatory interview was "unhelpful and improper," that "the Letter of Expectation was unwarranted and impractical," and that the reassignment of cases to Jambois was an act of retaliation. In each case, a jury would appear to have the tools and skills necessary, without any special

expertise, to synthesize conflicting testimony and determine the truth as a factual matter.

Judge Malmstadt also offers testimony as to whether an attorney has an ethical obligation to resign if he is unable to adequately perform his duties, and also offers an opinion as to whether plaintiff had improper relationships with victims and victim witness staff. As to the former, the parties might be better served by offering a jury instruction, rather than calling an expert to usurp the court's obligation to advise the jury on law and professional ethics. As to the latter, it is again unclear why a jury could not assess the reasonableness of the district attorney office's work with victims. Given these concerns, the court wishes to hear argumentation at the final pretrial conference as to why the testimony of both Judge Malmstadt and James J. Martin is admissible.

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

The court now turns to defendants' pending motion for summary judgment. Jambois claims that the defendants engaged in First Amendment retaliation and constructively discharged him because of his electoral conduct. At summary judgment, defendants argue these claims are barred by absolute prosecutorial immunity, qualified immunity, and the policymaker exception to the First Amendment's ban on patronage dismissals. They also argue that plaintiff cannot prove the elements of his causes of action.

Summary judgment is appropriate if (1) "there is no genuine dispute as to any material fact" and (2) those facts establish that defendants are each "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, all reasonable inferences must be drawn in favor of plaintiff as the nonmoving party. *Ozlowski v. Henderson*, 237 F.3d 837, 839 (7th Cir. 2001) (citing *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir.

1998)). To avoid summary judgment, plaintiff must marshal enough evidence -- not merely a scintilla -- to permit a jury to rule in his favor. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998) (internal citations omitted).

I. Bars to Suit

   A.   **Absolute Prosecutorial Immunity**

Defendants' assertion of absolute immunity is premised on the notion that the alleged acts of retaliatory discipline all involved prosecutorial conduct and are, therefore, protected by the absolute immunity doctrine. At best, this is a far too simplistic an application of the doctrine. At worst, it is a complete misrepresentation of the record at summary judgment. The absolute immunity doctrine does *not* protect every decision of a prosecutor, as it applies only to conduct "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009). Such conduct need not occur in a formal proceeding, as "the duties of the prosecutor in his role as advocate for the state involve actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Imbler v. Pachtman*, 424 U.S. 409, 431 n.33 (1976). Instead, courts employ a "functional approach" to determine if an activity is within the scope of prosecutorial duties and is therefore protected by absolute immunity. *Heyde v. Pittenger*, 633 F.3d 512, 517 (7th Cir. 2011).

Because it is presumed "that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties," there has been reluctance to extend the latter "any further than its justification would warrant." *Burns v. Reed*, 500 U.S.

8

478, 486-87 (1991) (internal quotation marks omitted). For this reason, absolute immunity does not typically shield a prosecutor's conduct as an "administrator rather than as an officer of the court." *Imbler*, 424 U.S. at 431 n.33; *see also Swetlik v. Crawford*, 738 F.3d 818, 824-25 (7th Cir. 2013) (holding that decision to terminate an employee is administrative conduct that is not protected by absolute prosecutorial immunity). The Supreme Court has nevertheless extended absolute prosecutorial immunity to administrative conduct of "a kind that itself is directly connected with the conduct of a trial." *Van de Kamp*, 555 U.S. at 344.

In *Van de Kamp*, the plaintiff alleged a district attorney and his chief assistant were responsible for their office's failure to make a required disclosure of impeachment material during his trial, on the theory that the disclosure would have been made if the district attorney and chief assistant had adequately trained, supervised and provided deputy district attorneys with better information systems. *Van de Kamp*, 555 U.S. at 343-44. While the Supreme Court agreed that the defendants' conduct was administrative in nature, it still chose to extend absolute immunity because "unlike with other claims related to administrative decisions, an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim." *Id*. at 344. The Court also noted that such activities "necessarily require legal knowledge and the exercise of related discretion, *e.g.,* in determining what information should be included in the training or the supervision or the information-system management." *Id*.

As an initial matter, none of the alleged retaliatory conduct at issue here involves a "specific criminal trial." *Van de Kamp*, 555 U.S. at 344. At most, some of the challenged

9

conduct involves the training and supervision of plaintiff as a subordinate prosecutor, which *Van de Kamp* found to be administrative conduct. *Id*. Since this supervision was of Jambois's behavior *as a prosecutor*, defendants argue it too "require[d] legal knowledge and the exercise of related discretion." *Id*. But prosecutorial immunity does not extend to essentially administrative conduct, simply because it is claimed to be pretextual retaliation *against a prosecutor*. Immunizing a prosecutor's office from any liability for retaliation and constructive discharge based on an exercise of speech would needlessly remove First Amendment protection from prosecutors who would participate in elections and, in doing so, not only chill their freedom to speak about matters of public importance, but also potentially deny the public a choice of candidates who might otherwise be among the most qualified to challenge existing office holders.

Nor would doing so advance the reasons identified by the Supreme Court in *Imbler* for extending common law prosecutorial immunity to § 1983 actions. The Court's primary rationale was that "[t]he public trust of the prosecutor's office would suffer if he were constrained in making every decision by the consequences in terms of his own potential liability in a suit for damages." *Imbler*, 424 U.S. at 424-25. This cautions against allowing criminal defendants to sue prosecutors in their individual capacity, as "[s]uch suits could be expected with some frequency, for a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate." *Id*. at 425. In this case, there is no reason to expect a similar flood of litigation brought *by government prosecutors* alleging retaliatory conduct for participating in discourse on matters of public importance. This is in stark contrast to *Van de Kamp*, where the Court

feared that "the ease with which a plaintiff could restyle a complaint charging a trial failure so that it becomes a complaint charging a failure of training or supervision would eviscerate *Imbler*." 555 U.S. at 347.

The Supreme Court was similarly concerned that "suits that survived the pleadings would pose substantial danger of liability even to the honest prosecutor," as they "often would require a virtual retrial of the criminal offense in a new forum, and the resolution of some technical issues by the lay jury." *Imbler*, 424 U.S. at 425. As a result, "the honest prosecutor would face greater difficulty in meeting the standards of qualified immunity than other executive or administrative officials." *Id*. Here, because the relevant conduct does not involve a specific criminal trial, there is no comparable rationale to deviate from the presumption in favor of qualified immunity. Nor would subsequent review of a criminal trial be influenced by "the subconscious knowledge that a post-trial decision in favor of the accused might result in the prosecutor's being called upon to respond in damages for his error or mistaken judgment." *Id*. at 427.

While acknowledging that some of these concerns are not applicable, defendants argue that at least plaintiff's allegation that his caseload was manipulated is a challenge to a prosecutorial, rather than an administrative, function because it involved the aggregate sum of individually-protected decisions to add or remove a prosecutor from particular cases. In addressing whether absolute immunity should protect an official's decision to appoint a special prosecutor, the Ninth Circuit stated that:

> Decisions related to general conditions of employment— including decisions to hire, promote, transfer, and terminate— and which do not affect the prosecutor's role in any particular matter are generally not sufficiently related to the initiation

> and conduct of a prosecution in a court of law or their role as an advocate of the state to qualify for absolute immunity. Decisions related to appointments and removals in a particular matter will generally fall within the exercise of the judge's or prosecutor's judicial and quasi-judicial roles and are shielded from suit by absolute immunity.

*Lacey v. Maricopa Cty.*, 693 F.3d 896, 930-31 (9th Cir. 2012).

Certainly, the decision to add twenty cases to Jambois's caseload -- allegedly to undermine his performance and force his resignation -- falls closer to conduct that might be protected by prosecutorial immunity. However, *Lacey* concerned a target of a special prosecutor's ability to sue the official who appointed the special prosecutor, which more directly implicates the policy of avoiding litigation based on allegations of misconduct in a specific criminal case. *Id*. at 933 ("[i]f a district attorney were not entitled to absolute immunity, defendants could bring retaliatory lawsuits against him for appointing their prosecutor or special prosecutor."). Here, plaintiff does not predicate his allegation upon misconduct *in a specific criminal trial* (much less his own trial) but instead upon the result of his being assigned *twenty* cases.

Even accepting that the reassignment involved specific cases, plaintiff's claim does not go to the exercise of prosecutorial discretion with respect to proceeding in those cases, or how to do so, but rather an administrative decision to balance out workloads. Although, as in *Lacey*, there may be instances where second guessing the choice of *who* should prosecute a case invades the exercise of prosecutorial discretion -- the defendants themselves maintain the decision was made to transfer twenty easy cases to plaintiff, while plaintiff maintains it was to burden him with the twenty most challenging cases of another assistant district attorney. Ultimately, the *Lacey* ruling can only be understood in the

context of *Goldstein*, as both cases involved a criminal defendant's grievances with their specific prosecutions. Particularly with appropriate instructions, a jury can discern the actual motivation behind the reassignment of cases without invading defendants' exercise of prosecutorial discretion in pursuing those specific cases.

### B. Qualified Immunity

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). A court therefore asks: "(1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Id*. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012) (internal quotation marks and brackets omitted). This requires "existing precedent [to] have placed the statutory or constitutional question beyond debate." *Id*. As a result, the inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).

Seizing upon this last requirement, defendants argue that their allegedly retaliatory conduct violated no clearly established right because "there is no case law suggesting that issuing a performance review, reassigning cases or demanding compliance with Office

13

policy through a non-disciplinary Letter of Expectation amounts to a constitutional violation." (D.'s Reply Br. (dkt. #125) 14.) The qualified immunity standard does not, however, require *this* level of granularity. It is enough to find that government employees, such as plaintiff, have a clearly established First Amendment right not to be subjected to retaliation or constructive discharge for their exercise of free speech about matters of public concern during a public election. Indeed, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This is because "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (internal quotation marks and brackets omitted) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

While there may not be a previous case involving First Amendment retaliation effectuated by the manipulation of procedures in a district attorney's office, the circumstances here, at least when viewed in a light most favorable to plaintiff, are clearly encompassed by the right of government employees, such as plaintiff, not to be subjected to retaliation for their speech about matters of public concern. Defendants are free to argue, as they do, that their actions were not disciplinary, retaliatory, or motivated by plaintiff's electoral conduct, but such claims are irrelevant to the "salient question" of whether the contemporaneous state of the law gave them "fair warning that their alleged treatment of [plaintiff] was unconstitutional." *Hope*, 536 U.S. at 741. Though such claims certainly bear on plaintiff's larger effort to prove a violation of his First Amendment rights,

14

they provide no reason to extend qualified immunity on the basis that such rights are not clearly established. Again, the challenge for trial will be to craft instructions to help the jury understand precisely what it is being asked to decide.

### C. The Policymaker Exception

Finally, defendants argue that even if plaintiff were to prove retaliation for his electoral conduct, he is not entitled to relief because "the First Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Hagan v. Quinn*, 867 F.3d 816, 826 (7th Cir. 2017). The court will assume in deciding this motion that plaintiff held a policymaking position "author[izing], either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation," *id*. at 824, and that plaintiff's electoral speech that was critical of his superiors involved matters of public concern. Even with the benefit of these assumptions, however, the policymaker exception does not authorize retaliatory harassment, and therefore does not apply to defendants' alleged misconduct here.

The policymaker exception presumes that a "dismissal is aimed at serving the public interest in efficient and effective government, [but recognizes that] it would be illogical to apply the same presumption to harassment designed specifically to hinder or to disrupt a [policymaker subordinate] in the performance of his duties." *Wallace v. Benware*, 67 F.3d 655, 662 (7th Cir. 1995). This is because "the effectiveness and efficiency of a unit of local government . . . is not served by a campaign of petty harassment that generally makes

15

it more difficult for the deputy to do his job, even if the ultimate goal of that harassment is to prompt . . . resignation." *Id*. at 663. So even if a decision to discharge a policymaker subordinate is protected, a decision to constructively discharge the same subordinate by harassment remains unprotected.

Here, plaintiff alleges that he was intentionally assigned an unmanageable caseload and subjected to disciplinary requirements that undermined his effectiveness as a representative of Dane County. Unlike a formal discharge, such conduct cannot be presumed to promote efficient and effective governance. Defendants' attempt to distinguish *Wallace* by arguing that plaintiff was merely asked to comply with general office policies is really just to argue that there was no harassment; but plaintiff has offered adequate evidence for a reasonable jury to find that only he was made to follow certain policies -- such as the restrictions on his use of paralegals and witness scheduling practices. It is also disputed whether plaintiff was assigned an unreasonable caseload. A jury must therefore decide the factual question of whether harassment occurred, which precludes an application of the policymaker exception before trial.

## II. MERITS

### A. Constructive Discharge

Defendants argue that plaintiff cannot bring a case for constructive discharge against the individual defendants because they are not his employer, reasoning that only an employer can be liable for hiring and firing decisions. This argument overlooks that plaintiff's First Amendment claim is a predicate to plaintiff's constructive discharge claim.

(*See* January 25, 2018 Opinion and Order (dkt. #46) 7.) Regardless, at least some of the defendants, such as Ozanne, possessed this authority.

Defendants next argue that plaintiff cannot possibly satisfy the standard for constructive discharge, as it requires either proof of "unbearable" working conditions under "a *more* demanding standard than [that for] a claim of retaliation for his exercise of his free speech rights" or proof that "an objective employee in [the plaintiff's] position would have known from [his employer's] actions that his job and career [at the employer] were over." *Cockroft v. Moore,* 638 F. Supp. 2d 1024, 1035-36 (W.D. Wis. 2009). This argument is just a rehashing of defendants' one-sided version of the facts of record. Indeed, defendants again argue that plaintiff was merely required to follow general office policies, ignoring plaintiff's evidence that no other employees were subjected to similar requirements related to the use of paralegals and witness scheduling practices. Defendants also ignore plaintiff's testimony that otherwise unremarkable features of the district attorney's office, such as the ability to assign cases, were manipulated in an intentionally retaliatory manner.

Defendants further argue that plaintiff could have asked for help, while ignoring plaintiff's claims that: (1) he *did* reach out to his superiors to obtain relief from his schedule (P's Resp. to DPFOF (dkt. #111) at ¶¶ 155-56.); and that (2) he communicated his belief that the witness procedures were too onerous and were the result of retaliation. Moreover, the current record would allow the trier of fact to find that defendants did not respond to plaintiff's efforts to communicate. (D's Resp. to PFOF (dkt. #126) at ¶¶ 257-60.) A jury might infer from these facts that plaintiff reasonably concluded further communication was pointless because defendants were actively trying to manufacture grounds to discharge

him. While defendants argue this communication made no explicit reference to plaintiff's potential departure or termination, that is beside the point. Finally, even if plaintiff was planning to leave, he was still entitled to avoid an earlier-than-expected constructive discharge effectuated by harassment for his exercise of free speech.

### B. First Amendment Retaliation

Defendants argue that plaintiff cannot prove First Amendment retaliation, which requires that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 553 (7th Cir. 2009) (quoting *Woodruff v. Mason*, 542 F.3d 545, 551 (7th Cir. 2008)). Defendants do not question that plaintiff's electoral conduct was such protected activity and, for the deterrence component, merely repeat their claim that he was only required to comply with general office policies.

Focusing on the motivating factor component, defendants argue that complaints about plaintiff's performance (which they allege led to their supervisory actions) were made prior to plaintiff's electoral campaign. This is insufficient, however, as a jury could reasonably find that the intensity of the alleged retaliatory conduct was affected by his electoral conduct, regardless of whether some amount of supervision was motivated by preexisting complaints (which, in any case, remains disputed). While defendants also argue that many of the alleged acts of retaliation, such as the modification of plaintiff's caseload, have benign explanations -- those explanations also require credibility determinations since a jury could reasonably find them unpersuasive when examining the totality of the

circumstances. Finally, whether the alleged acts of retaliation constituted formal discipline is also subject to reasonable dispute.

ORDER

IT IS ORDERED that:

1) Defendants' motion for summary judgment (dkt. #67) is DENIED.

2) Defendants' motion to strike (dkt. #96) is RESERVED.

Entered this 15th day of August, 2018.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge